STATE *ex rel.* WILLIAM W. DOWNEY *v.* EDGAR B. SIMS, *Auditor, etc.*

(No. 9491)

Submitted April 20, 1943. Decided May 18, 1943.

KENNA and FOX, JUDGES, dissenting.

*R. D. Bailey, J. O. Henson* and *L. E. Given,* for relator.
*Ira J. Partlow,* Assistant Attorney General, for respondent.

ROSE, JUDGE:

On the 30th day of March, 1943, the Governor of the State, in vacation of the Senate, in regular form, appointed William W. Downey to fill a vacancy then existing in the membership of the Board of Control. Downey, on

the following day, qualified as such by taking the oath and giving the bond required by law, and thereupon entered on the performance of his duties as a member of the Board. In due course the Board by its proper officer made requisition on Edgar B. Sims, the Auditor of the State, for the sum of Thirteen Dollars and Forty-four Cents ($13.44), as the amount due to Downey as his salary for the one day in March which he had served, as based on the regular salary of the office, Five Thousand Dollars ($5,000.00) per year. This requisition was duly approved as required by law by the State Director of the . Budget. The Auditor, however, declined and refused to honor the requisition by a letter, directed to the Board, in which he said:

"I have your requisition for the payment of compensation of Honorable W. W. Downey, Member of the State Board of Control, for March 31, 1943, being one day, in the sum of $13.44.

I have knowledge of the fact that Mr. Downey was appointed by the Governor as a member of the West Virginia Liquor Control Commission and that the appointment was rejected by the Senate at the 1943 session of the Legislature, and that Mr. Downey was appointed as a member of the Board of Control after the adjournment of the 1943 Legislature.

Senate Bill No. 22, passed February 16, 1943, and effective from passage, provides:

'No person whose nomination for office has been rejected by the Senate * * * shall * * * be appointed, during the recess of the Senate in which his nomination was rejected, to any other office the nomination for which must be submitted to the Senate for confirmation.'

Of course you are advised that the appointment by the Governor of a member of the Board of Control must be submitted to the Senate for confirmation.

Mr. Downey's appointment is clearly within the ban of Senate Bill No. 22. I understand that there is a question as to the constitutionality of the bill. I do not undertake to pass on the question, but I am definitely of the opinion that the facts presented make out a case proper for judicial determination.

I am therefore declining to honor the requisition."

It is thus seen that the Auditor based his rejection of the requisition solely on the provisions of Senate Bill No. 22, and that he recognized that its constitutionality was questioned.

Thereupon Downey, as relator, filed in this Court a petition, duly verified, setting up these facts and charging that said Senate Bill No. 22 (Chapter 52, Acts of Legislature 1943, not yet published) is unconstitutional; and praying for a writ of mandamus requiring the Auditor to approve for payment the requisition for his salary. On this petition we issued a rule directing the Auditor to show cause, if any he could, why the writ should not be awarded. By way of return to this rule the Auditor filed a demurrer and answer to the petition, by which nothing in the petition was controverted except the charge that Senate Bill No. 22 is unconstitutional. The answer adds no fact to the record except the showing that the relator had, in fact, been appointed by the Governor and rejected by the Senate as a member of the Liquor Control Commission. There is, therefore, no issue whatever between the relator and the respondent except the legal question of whether Senate Bill No. 22 is constitutional. On this issue, and nothing else, the case has been briefed, argued and submitted. We, accordingly, accept the issue as made by the parties and shall consider and adjudicate this question alone.

Certain principles and rules of procedure in mandamus cases operate to guide us in our deliberations. Mandamus is a proper proceeding to enforce the payment of public salary or wages. *State ex rel. Goshorn v. Johnson,* 102

W. Va. 629, 135 S. E. 899; *State ex rel. Sprague* v. *County Court,* 93 W. Va. 481, 117 S. E. 135; *State ex rel. Henson* v. *County Court,* 93 W. Va. 316, 116 S. E. 704; *State ex rel. Hall* v. *County Court,* 82 W. Va. 564, 96 S. E. 966. A relator in mandamus for any purpose must show a clear legal right to the relief he seeks. *Hall* v. *Stepp,* 105 W. Va. 487, 143 S. E. 153; *State ex rel. Jones* v. *Kuhn,* 94 W. Va. 415, 120 S. E. 888; *State ex rel. Miller* v. *City of Spencer,* 93 W. Va. 516, 117 S. E. 226; *State ex rel. Qualls et al.* v. *Board of Education,* 92 W. Va. 647, 115 S. E. 726; *State ex rel. Smith* v. *County Court,* 78 W. Va. 168, 88 S. E. 662, 20 A. L. R. 1030. This showing, however, may be by a verified petition if its allegations are sufficient and not controverted. *Doolittle* v. *County Court,* 28 W. Va. 158; *Fisher* v. *City of Charleston,* 17 W. Va. 595; 35 Am. Jur., Mandamus, section 358, p. 100. It will be presumed that one appointed to office by the Governor is legally qualified therefor. *Booten* v. *Pinson,* 77 W. Va. 412, 89 S. E. 985, L. R. A. 1917A, 1244; *Swinburn* v. *Smith et al.,* 15 W. Va. 483. In showing his right to relief a relator in mandamus may challenge the constitutionality of a statute adverse to his claim. *Bridges* v. *Shallcross,* 6 W. Va. 562, *Ex parte Stratton,* 1 W. Va. 304; *Welch* v. *Swasey,* 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923; *Von Hoffman* v. *City of Quincy,* 4 Wall. (U. S.) 535, 18 L. Ed. 403. Except under special circumstances a prima facie showing of legal right to relief entitles the relator to the writ of mandamus. *State ex rel. Looney* v. *Carpenter,* 106 W. Va. 170, 145 S. E. 184; *State ex rel. Hall* v. *County Court,* 87 W. Va. 437, 105 S. E. 693; *Griffith* v. *County Court,* 80 W. Va. 410, 92 S. E. 676; *Trunick* v. *Town of Northview,* 80 W. Va. 9, 91 S. E. 1081; *Kline* v. *McKelvey,* 57 W. Va. 29, 49 S. E. 896. Indeed, there seems to be no disagreement between counsel that the petition is sufficient and that the relator is entitled to the peremptory writ he seeks if Senate Bill No. 22 is unconstitutional.

The section of the statute as it stood before the passage of Senate Bill No. 22 read as follows:

"In case of a vacancy, during the recess of the senate, in any office which is filled by appointment

by the governor and confirmation by the senate, the governor shall, by appointment, fill such vacancy until the next meeting of the senate, when the governor shall make a nomination for such office, and the person so nominated, when confirmed by the senate (a majority of all of the senators elected concurring by yeas and nays), shall hold his office during the remainder of the term, and until his successor shall be appointed and qualified. No person shall be so appointed during the recess of the senate who has been nominated to and rejected by the senate for the same office. * * *" Code, 1931, 3-10-11.

Senate Bill No. 22 attempted to amend the last sentence quoted so as to read as follows:

"No person whose nomination for office has been rejected by the senate shall be again nominated for the same office during the session in which his nomination was so rejected, unless at the request of the senate, nor shall he be appointed to the same office during the recess of the senate, nor shall he be appointed, during the recess of the senate in which his nomination was rejected, to any other office the nomination for which must be submitted to the senate for confirmation."

The constitutional provisions relating to the subject of gubernatorial appointments and senatorial consent to or rejection thereof are Sections 8 and 9 of Article VII, Constitution of West Virginia, which read:

"8. The Governor shall nominate, and by and with the advice and consent of the Senate, (a majority of all the Senators elected concurring by yeas and nays) appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the Legislature.

"9. In case of a vacancy, during the recess of the Senate, in any office which is not elective, the Governor shall, by appointment, fill such vacancy, until the next meeting of the Senate, when he

shall make a nomination for such office, and the person so nominated, when confirmed by the Senate, (a majority of all the Senators elected concurring by yeas and nays) shall hold his office during the remainder of the term, and until his successor shall be appointed and qualified. No person, after being rejected by the Senate, shall be again nominated for the same office, during the same session, unless at the request of the Senate; nor shall such person be appointed to the same office during the recess of the Senate."

It will be seen at once, therefore, that the Constitution and the section of the statute involved, before the latter's attempted amendment, agree absolutely in forbidding only that one nominated by the Governor and rejected by the Senate shall not be appointed by the Governor in vacation of the Senate to the same office; while Senate Bill No. 22 attempts to broaden this prohibition so as to include not only the same office but all other offices, nominations to which must be consented to by the Senate. Can the effect of the Senate's rejection as expressly provided in the Constitution be thus enlarged by an Act of the Legislature? We think it cannot.

In *Isaacs* v. *Ballot Commissioners,* 122 W. Va. 703, 12 S. E. (2d) 510, 512, Judge Maxwell observed that, "The right of a citizen to hold office is the general rule; ineligibility the exception. Courts are hesitant to take action resulting in deprivation of the privilege to hold office, except under clear and explicit constitutional or statutory requirement". This statement is quoted and approved in *State ex rel. Thomas* v. *Wysong,* 125 W. Va. 369, 24 S. E. (2d) 463. It indicates the correct approach to the problems to be solved in the present case.

The Constitution provides exactly what the Senate can do with regard to gubernatorial nominations to office: It may either consent to or reject the nominee for the particular office to which he has been nominated. This is the full maximum of the grant of power of the Senate over appointments by the Governor. And this grant of a specific and clearly defined power is, by im-

plication equally potent, a denial of any other power in the premises. The Constitution, however, goes further and prescribes an indirect result which shall ensue from a senatorial rejection: The nominee shall not be appointed by the Governor to the same office in vacation of the Senate. Here, again, the Constitution states fully and clearly the exact effect of the rejection and thereby impliedly says that it shall have no other or further effect. The Senate's rejection shall have this precise effect and no more. Again, the direct and inevitable result of this constitutional provision is to restrict, in some degree, the power of the Governor to appoint to office. By expressing exactly the limit of this effect on the Governor's appointing power, the Constitution impliedly declares that there shall be no other effect. Finally, from the viewpoint of the rejected nominee, the same reasoning is legitimate. By the Constitution he is declared ineligible for appointment to the same office in vacation of the Senate, which is legally equivalent to a constitutional declaration that his rejection by the Senate shall create no other ineligibility—that his eligibility to all other offices shall remain unchanged.

The principle of construction here applied is so ancient that its beginning cannot be found and is supported by cases which are simply overwhelming in number. *Expressio unius est exclusio alterius*. This classic maxim applies to all instruments requiring construction by courts— simple contracts, deeds, wills, statutes and constitutions. We have here expressly recognized it. *Taylor* v. *Taylor,* 66 W. Va. 238, 66 S. E. 690, 19 Ann. Cas. 414; *State* v. *Gilman,* 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847. In *State* v. *Gilman, supra,* it was applied in determining the constitutionality of a statute. The Constitution then provided that "laws may be passed regulating or prohibiting the sale of intoxicating liquors within the limits of this State". Constitution of West Virginia 1872, Article VI, Section 46. A statute had been enacted by the Legislature making it unlawful for one to "keep in his possession for another spirituous liquors, wine, porter, ale

634

or beer, or any drink of a like nature". Code 1887, Chapter 32, Section 1, as amended by Acts of Legislature 1887, Chapter 29, Section 1. This was held unconstitutional on the ground that the constitutional power to pass laws regulating the sale of intoxicating liquors by implication prohibited the power to make any other law in regard to the sale of liquors. Judge Snyder in the opinion at page 150 says:

"If the people had not made the provision above quoted a part of the constitution, the legislature would, so far as that instrument is concerned, have had plenary and unrestricted authority to deal with liquors in any manner it chose to do. But the people, by declaring that 'laws may be passed regulating or prohibiting the sale of intoxicating liquors,' according to the principles we have announced, imposed a restraint upon this plenary power. By granting an express authority to the legislature to regulate or prohibit the sale, there is an implied inhibition to the exercise of any authority in respect to that subject which is not embraced in the grant. This rule is simply an application of the old maxim, *expressio unius est exclusio alterius*, which Lord Bacon concisely explains by saying: 'As exception strengthens the force of a law in cases not excepted, so enumeration weakens it in cases not enumerated.' The express power here given to regulate or prohibit the sale of liquors, unless it was intended to limit the legislative authority, would render this provision of the constitution wholly nugatory and useless; because, as we have seen, without this provision the legislature would have had plenary power over the whole subject. It could not only have legislated in respect to the prohibition and sale of liquors, but in all other respects. It seems to me, therefore, that the purpose and effect of this constitutional provision was and is to restrict and limit the legislative authority to the powers expressly granted therein—that is, to the power to regulate or prohibit the sale of liquors; and, consequently, a legislative act not within the legitimate scope of this express grant, unless it

> is a fair and reasonable exercise of the police power, must be held unconstitutional and void."

Cases from other jurisdictions are: *State ex rel. Green* v. *Collison,* 9 Harr. Del. 245, 197 A. 836. *Priest* v. *City of Wapakoneta,* 8 O. O. 439, 32 N. E. (2d) 869. *Robinson* v. *Moser,* 203 Ind. 66, 179 N. E. 270; *Thompson* v. *Kay,* 124 Tex. 252, 77 S. W. (2d) 201; *Wynn* v. *State ex rel. District Attorney,* 67 Miss. 312, 7 So. 353; *State ex rel. Banker* v. *Clausen,* 142 Wash. 450, 253 P. 805.

By express grant of the Constitution the Senate has the specific power to render a person ineligible for appointment by the Governor to a particular office by the simple act of rejecting him for the same office. This result is definite and precisely stated. The Senate has from the Constitution no power to inflict upon him any greater ineligibility and the Constitution in affixing this result to his rejection by clear implication provided that no other result should follow. The people in enacting the Constitution clearly meant to give this effect and no other to the rejection of a gubernatorial nominee by the Senate.

The respondent would have us hold that the amendment made by Senate Bill No. 22 is in legal effect merely a legislative establishment of qualifications (or disqualifications) for interim appointees by the Governor. The Legislature may, of course, establish reasonable qualifications for any office which it creates. The Code as it now stands shows many instances of the exercise of this power. This Court has held such legislative acts proper and valid. *Booten* v. *Pinson, supra; McMillin* v. *Neeley,* 66 W. Va. 496, 66 S. E. 635; *Kahle* v. *Peters,* 64 W. Va. 400, 62 S. E. 691; *State ex rel. Thompson* v. *McAllister,* 38 W. Va. 485, 18 S. E. 770, 24 L. R. A. 343. And the amendatory statute in question may in some aspects be somewhat in the nature of affixing negatively a qualification for office. But this effect is only remote, indirect and incidental. Its immediate and major purpose is something else. The statute amended relates wholly to the power and process of appointing to office; and the amend-

ment occupies the same place in the Code. The constitutional provisions on which both are based are found in the article of the Constitution which defines the powers of the executive. The very place where the amendment is inserted in the orderly arrangement of our statutory law is some indication of its legislative purpose.

But the substance of the amendment clearly manifests that it does not in any degree relate to the capacity or ability of a citizen to hold or perform the duties of public office in general, or any public office in particular. The Senate's power to reject a gubernatorial nominee has nothing to do with his qualification for the office. That right and power is plenary and absolute, for reason or without reason. Consequently, a senatorial rejection cannot in any sense be construed as a finding by that body of a want of qualification for the specific place or any other and does not imply that his qualifications were even considered. Certainly it cannot be accepted as in any degree like unto a conviction of felony in its effect on the nominee's eligibility to another office. The inhibition against appointment in vacation to the same office, of course, is necessary to make a senatorial rejection of any effect whatever. But it does not, in reason or at law, have any bearing on his capacity or ability to serve in any of the other scores of positions to which appointment is to be made by the executive with the consent of the Senate. The bill in question clearly indicates that the Legislature did not regard this rejection by the Senate as properly constituting any finding on the nominee's incapacity or disqualification for the equally numerous positions to which he may be appointed without the Senate's consent, or to the greater number of more important offices to which he may be elected by the people. We thus see that the Legislature was concerning itself, not with qualifications for office, but with the Governor's power to appoint in vacation of the Senate without its consent, one whom that body had found unacceptable for another wholly different position. The very form of the amendment, its substance, and its place in the code, agree

in the indication of its character and purpose. Its passage by both houses of the Legislature by overwhelming majorities, the refusal of the Governor to give it his approval, and the immediate repassing of the bill over this veto, all of which we may notice, at least, do not detract from this conclusion.

If doubt still remains as to the character of this amendment, we need only look to its title: "A Bill to amend and reenact section eleven, article ten, chapter three of the code of West Virginia, one thousand nine hundred thirty-one, relating to vacancies in office to be filled by the governor by and with the advice and consent of the senate." There is no possibility of construing this title as relating to the subject of qualification for any office. Even if the Act unequivocally attempted to establish such qualifications, the provision would clearly be outside its title and for that reason alone unconstitutional.

We hold, therefore, that Senate Bill No. 22 in so far as it purports to prohibit a person rejected by the Senate for an office to which he has been nominated by the Governor, from being appointed by the Governor in vacation of the Senate to another office, nomination to which must be consented to by the Senate is unconstitutional. The demurrer and answer of the respondent are, therefore insufficient for any purpose in this case and the peremptory writ will be awarded as prayed for. *Doolittle* v. *County Court, supra. Fisher* v. *City of Charleston, supra. Bridges* v. *Shallcross, supra.*

After the submission of this case, but at the suggestion of a member of the Court made during oral argument, there was lodged among the papers herein, but not made a part of the record by any order, a stipulation by counsel showing that the vacancy to which the relator has been appointed began May 24, 1942, between which time and the date of the present appointment the Senate has been in regular session and adjourned. Upon mature consideration we find the facts thus attempted to be stipulated are not proper to be considered on any issue evolved in this case, and accordingly the stipulation is not filed or considered.

*Writ awarded.*

Fox, JUDGE, dissenting:

The relator's petition alleges that "on the 30th day of March, 1943, and prior thereto there existed a vacancy as to one of the members of said Board of Control". The period during which such vacancy existed is not stated in the petition, nor in the demurrer or answer of the respondent. Inquiry at the bar of the court, on the oral argument, disclosed that such vacancy had existed on and after May 24, 1942, and the following stipulation, signed by counsel for the petitioner and the respondent, was made.

> "It is stipulated and agreed by and between counsel for plaintiff and counsel for defendant, and by leave of the Court made a part of the record in this case, as follows:
>
> "A vacancy occurred in the membership of the West Virginia Board of Control on the 24th day of May, 1942, and no person was designated by the Governor as an appointee to fill such vacancy until the 30th day of March, 1943, on which date the plaintiff herein, Wm. W. Downey, was by the Governor designated as an appointee to fill such vacancy.
>
> This 20th day of April, 1943."

This is the stipulation mentioned in the concluding paragraph of the majority opinion, and which the majority refuse to consider. However, that refusal does not alter the facts therein stated.

I assume that we are warranted in taking judicial notice of the fact that the Senate of the State of West Virginia was in regular session from the 13th day of January, to the 13th day of March, 1943, both inclusive, and that no nomination to fill the vacancy in the Board of Control, existing during such period, was submitted by the Governor to the Senate while it was in session.

The question of whether or not, independent of the action of the Legislature in enacting Senate Bill No. 22, Chapter 52, Acts of the Legislature, 1943, the Governor had the constitutional power in the circumstances, to make

the appointment of the relator is a highly important one, and in my judgment the most important question arising in this proceeding. It should be faced with courage and answered in like fashion. If a mandatory duty, imposed by the Constitution upon the Governor of this State, may be disregarded, and rights asserted which grow out of such disregard, and the same be established, as, in my judgment would be the result of awarding the writ in this proceeding, the public is entitled to know on what grounds we base our decision, and it is not a question which should be evaded upon any technical point, such as a failure to raise the question on the pleadings. The question has been raised outside of the pleadings. Every member of this Court, and every informed citizen of the State, knows, from the stipulation filed, and which purports to be a part of the record, that the Governor made no appointment to fill the vacancy in the Board of Control after May 24, 1942, and prior to the convening of the Senate in January, 1943; and did not make a nomination for said vacancy while the Senate was in session. This much is known by reference to the stipulation quoted above, and from the judicial knowledge which may be taken of the public records of the Senate. I know of no law, rule or practice which prevents a court from bringing out into the open the full truth as it may affect questions of high public interest, such as I conceive this to be. It is not uncommon that matters are stipulated in private litigation and such stipulations considered as though the facts stated therein appeared in the formal pleadings and proofs presented to the court. If this be true there is still greater justification for such practice in public matters. And, may I ask, who are we to say that what the parties have agreed and stipulated may be treated as a part of the record shall not be so treated, and thus arbitrarily refuse to consider the most far reaching and important question here involved. Holding this view, I purpose, first, to take up the question of whether under the Constitution, and independently of the enactment of Senate Bill No. 22, the Governor had the constitutional power to fill the vacancy in the Board of Control by the

appointment of the relator, after the final adjournment of the State Senate.

I assume that it will be conceded that to entitle the relator to the relief prayed for in his petition he must show a clear legal right thereto. *Smith* v. *County Court,* 78 W. Va. 168, 88 S. E. 662, 20 A. L. R. 1030; *State* v. *Spencer,* 93 W. Va. 516, 117 S. E. 226; *State* v. *Kuhn,* 94 W. Va. 415, 120 S. E. 888; *Hall* v. *Stepp,* 105 W. Va. 487, 143 S. E. 153; *State* v. *Road Commission,* 108 W. Va. 41, 151 S. E. 319; *Koebert* v. *Clarksburg,* 114 W. Va. 406, 171 S. E. 892; *Wells* v. *Road Commission,* 114 W. Va. 709, 173 S. E. 576; *Brumfield* v. *Board of Education,* 121 W. Va. 725, 6 S. E. 2d 238; *Ebert* v. *Bouchelle,* 123 W. Va. 265, 14 S. E. 2d 614. I contend that the facts stipulated show conclusively that the appointment of the relator was illegal and void, and, therefore, that he is not entitled to hold the office to which his alleged appointment relates.

On March 30, 1943, the relator was allegedly, appointed by the Governor as a member of the Board of Control, an office created by the Legislature. As stipulated, said appointment was made to fill a vacancy which occurred on the 24th day of May, 1942, more than ten months prior to the date of the alleged appointment. We take judicial notice of the fact that the regular session of the Legislature of 1943 convened on the 13th day of January, 1943, and remained in session for sixty days. It is stipulated that no appointment was made by the Governor to fill the vacancy which occurred on May 24, 1942, until March 30, 1943, and we know from the records of the State Senate that no nomination for said office to fill such vacancy was submitted to the Senate while it was in session. Therefore, the question of the right of the Governor to make the appointment under which relator's claim is presented, is squarely presented; for, if the Governor was without constitutional power to make the appointment, the relator has no right to occupy the office in question, and no right to the salary attached thereto. This question arises independently of Senate Bill No. 22, and could have been raised had such bill not been enacted, although the Act does, in

effect, if not directly, provide a legislative construction of the constitutional provision pertaining to the power of the Governor in respect to the nomination or appointment of public officials.

Sections 8 and 9 of Article VII of the Constitution of this State read as follows:

"8. The Governor shall nominate, and by and with the advice and consent of the Senate, (a majority of all the Senators elected concurring by yeas and nays) appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed or elected by the Legislature.

"9. In case of a vacancy, during the recess of the Senate, in any office which is not elective, the Governor shall, by appointment, fill such vacancy, until the next meeting of the Senate, when he shall make a nomination for such office, and the person so nominated, when confirmed by the Senate, (a majority of all the Senators elected concurring by yeas and nays) shall hold his office during the remainder of the term, and until his successor shall be appointed and qualified. No person, after being rejected by the Senate, shall be again nominated for the same office, during the same session, unless at the request of the Senate; nor shall such person be appointed to the same office during the recess of the Senate."

A careful reading and study of these sections of our Constitution, when considered together, should convince any fair minded person, that the intent of the framers of said instrument was, first, to vest in the Governor what is termed the appointing power, in all cases not otherwise provided for; but to place a restriction on such power in this: That as to all offices, the appointment of which requires the advice and consent of the Senate, the Governor could only nominate in the first instance, and could only appoint after the Senate had consented thereto; and, second, that during a session of the Senate it should be

the duty of the Governor to submit all nominations for so-called confirmation, is too clear to justify discussion. Even where an appointment to fill a vacancy is made under Section 9, the Governor is required, at the next session of the Senate, to submit a nomination, and if he does not, the recess appointment counts for nothing. This being true, and I dare say it will not be disputed, how can it be contended that it was not the plain mandatory duty of the Governor to submit to the 1943 session of the Senate a nomination for the then existing vacancy in the Board of Control. If, at any time after May 24, 1942, he had made an appointment to fill such vacancy, that appointment would have had no effect upon the adjournment of the next session of the Senate. Could the Governor, then, re-appoint the same person on the theory of a new vacancy or a continuance of the old one? Had he submitted the nomination of his appointee to the Senate for the unexpired term, and that nomination had been rejected, then under the Constitution he could not have re-appointed him. Can the Governor evade or violate the terms of the Constitution and still retain the right of appointment? To say he can do so is to lose sight of all legal and moral restraints which high officials should feel obligated to regard. If the Governor can do this as to one office, why not as to all? If a governor can refuse to submit to the Senate a nomination, in the middle of his term of office, as to one office, why can he not refuse as to all where vacancies have occurred by resignation or otherwise, in the recess of the Senate, and then after the Senate adjourns, fill the various offices by appointments which will hold for the balance of his term, and thus deprive the Senate of its constitutional right to advise and consent to appointments to office requiring Senate confirmation.

But it may be said that no governor will ever again violate, in this respect, the spirit and intent, and the express provisions of the Constitution. Without intending to reflect upon the motives of the Governor, I can only say that it has happened as to one vacancy and as to one office, and if we permit this action to pass unchallenged, who

can say that it may not happen again, and in an exaggerated form? Great and widespread abuses in government often have their beginning in single and relatively unimportant departures from correct principles and practices. The time to scotch evil is when it first raises its head.

To this point I have dealt with the duty of the Governor to submit appointments to the Senate, at the first opportunity after the term of an official has expired, or a vacancy for any cause has happened. In such event recess appointments may be made, an appointment which carries with it the full power of the office; not merely a nomination to which the Senate may advise and consent, or, on the other hand, reject. But this appointment is only effective until the next session of the Senate. Then a nomination must be made, and the right of the Senate to approve or reject attaches.

When may the Governor make this appointment? For an answer to this question we must go to the Constitution. He has no inherent power of appointment, and this, in my opinion is the key to the question before us. 12 C. J. 898, 16 C. J. S. 509, 24 Am. Jur. 826, 42 Am. Jur. 951-981; *Heyward* v. *Long*, 178 S. C. 351, 183 S. E. 145, 114 A. L. R. 1130; *State* v. *Bowden*, 92 S. C. 393,.75 S. E. 866. Our Constitution, Section 8, Article XII, negatives the idea of any inherent appointive power in the Governor, but confines such power to cases where the appointment or election of an official is "not otherwise provided for". He has the power of appointment to fill a vacancy during the recess of the Senate, even though the statute may not, in terms, confer the right as to a particular office. *Brandon* v. *Board of Control*, 84 W. Va. 417, 100 S. E. 215.

Section 9, Article VII of the Constitution provides: "In case of a vacancy, during the recess of the Senate, in any office which is not elective, the Governor shall by appointment, fill such vacancy, until the next meeting of the Senate, when he shall make a nomination for such office * * *". Note that the Constitution says he "shall" make an appointment, and "shall" make a nomination. What would happen if he made the appointment, and then

failed to make a nomination, is discussed above, and evidently it was never contemplated that a Governor would ever fail to do either, first, because of the mandatory requirements of the Constitution and second, because of the public interest and advantage in having public offices filled at all times. It may be assumed that offices are created by the Legislature, and certain functions of government attached thereto, with the idea that they shall be occupied and not left vacant at the discretion of the executive. But a vacancy existing, a governor has failed to make a nomination to fill the same, at a session of the Senate following the happening of the event creating the vacancy, then after the Senate adjourns, has attempted to make an appointment to fill the vacancy which he could and should have attempted to fill by making a nomination when the Senate was in session. A situation which reasonable men had the right to feel never could arise now confronts us, and it must be dealt with as its importance merits. I am not so much concerned as to who occupies the office of a member of the Board of Control. All should be concerned that a sound precedent for the future is established.

I contend that, under the Constitution the Governor's power of appointment, as distinguished from his power to nominate, and then, with the advice and consent of the Senate to appoint, only extends to such vacancies as occur during the recess of the Senate, and continues only until the next session of the Senate, when he must make a nomination for the same office so filled by his appointment. The vacancy in the Board of Control having occurred on May 24, 1942, the Governor had the right to fill the vacancy until the meeting of the Senate in January, 1943, at which time it was his duty to make a nomination. Not having done so at the opening session of the Senate, nor at any time during its sixty days session, he lost the right to make the appointment to the said office after the Senate adjourned. Not having the legal power to appoint the relator, his appointment was and is invalid, and fails to furnish any basis of legal right to the office he claims or to its emoluments.

The question is new in this State, but it has been considered in other jurisdictions. 42 Am. Jur. 982, states the general rule:

"Where an incumbent is entitled to hold over after the expiration of his term until his successor is chosen, it is generally held that a vacancy authorizing a recess appointment does not occur upon the mere expiration of the term. The power to make a recess appointment is usually confined to vacancies occurring during such recess, as distinguished from such as happen while the confirming body is in session. Thus the President has been denied the power to make a recess appointment to fill a vacancy occurring while Congress was in session, and a governor, it seems, may not during a recess of the senate fill a vacancy that existed while that body was in session. If the office is one which the governor may fill by appointment with the advice and consent of the senate, he may not make a recess appointment to fill a vacancy in it, unless he is empowered to do so by constitutional or statutory provision."

In *Schenk* v. *Peah,* (Fed. Cas. No. 12,451) 1 Dillon's Circuit Court Reports, 267, it was held "where an office was created and took effect during a session of the senate, and a subsequent session of Congress passed without the office being filled; held, that the President could not make a valid appointment to such office in the recess of the senate". That was a case arising under the Federal Constitution, which provides that the President: "shall have power to fill up all vacancies that may happen during the recess of the Senate" (Article II, Section 2). Our Constitution, Article VII, Section 9, provides that "in case of a vacancy during the recess of the Senate", the Governor shall appoint. The difference between the two provisions, if any, is a highly technical one, hardly sufficient to base a holding that an Act of the Legislature is unconstitutional. To the average mind they mean exactly the same thing. Additional authority for the proposition announced will be found in *Mitchell* v. *Sohmer,* 209 N. Y. 151, 102 N. E. 593, 46 L. R. A. (N. S.) 1202; *Heyward* v. *Long, supra;* and

extensive annotations in 17 Annotated Cases 1012, 46 L. R. A. (N. S.) 1202, 50 L. R. A. (N. S.) 337-359.

I am, therefore, of the opinion that at the date of the relators alleged appointment, the Governor was without constitutional power to make the same, and that, for that reason alone the writ prayed for should be denied. I think, however, that the other question presented, and which is discussed in the majority opinion, is entitled to consideration.

Confining the discussion to the pleadings, and ignoring the question raised by the stipulation, the case here presented involves the constitutionality of an Act of the Legislature, Senate Bill No. 22, enacted on the 16th day of February, 1943, and made effective from passage. The act was disapproved by the Governor, and again passed over the veto of the Executive on February 24, 1943. The provisions of the Act, which are now under consideration, read as follows:

"No person whose nomination for office has been rejected by the Senate shall be again nominated for the same office during the session in which his nomination was so rejected, unless at the request of the Senate, nor shall he be appointed to the same office during the recess of the Senate, nor shall he be appointed during the recess of the Senate in which his nomination was rejected, to any other office the nomination for which must be submitted to the Senate for confirmation. No appointee who resigns from any such office prior to confirmation, whose name has not been submitted for confirmation while the Senate is in session, shall be eligible, during the recess of the Senate, to hold any office the nomination for which must be confirmed by the Senate".

It is clear that the Legislature had in mind two separate and distinct purposes. One, to prevent the appointment by the Governor to any office requiring Senate confirmation, during the recess of the Senate, of any person who may have been rejected by the Senate while in session, to any other office, thus extending the restriction of the Gover-

nor's appointive power to that extent. And, second, to prevent the resignation of officials, and failure to submit nominations to fill vacancies created thereby, and thus prevent Senate confirmation of those persons whose nominations would, under ordinary circumstances be submitted to the Senate. In my opinion, even if we should hold that the Act, as to the first purpose, was an unwarranted restriction on the constitutional powers of the Governor, and, therefore, unconstitutional, such holding would not necessarily require the same holding as to the second mentioned purpose. This portion of the Act the majority opinion completely ignores.

I apprehend that there will be little dispute as to the rule which should control us in appraising the constitutionality of an Act of the Legislature. When the people by a State Constitution confer upon the Legislature all legislative powers, as we have done in West Virginia, not impose an unwaranted restriction on the constitu-Constitution, Article VI, Section 1, that power is absolute save and except as it may be limited by other provisions of the same constitution, or restricted by the delegated powers vested in the Federal Government under the Federal Constitution. The extent of legislative power, and its relation to both executive and judicial power, has not been more clearly stated than in the following quotation taken from Cooley's Constitutional Limitations, Eighth Edition, Volume 1, page 175, which reads:

"There are two fundamental rules by which we may measure the extent of the legislative authority in the States: —

1. In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined

legislative powers, but is intrusted with the general authority to make laws at discretion.

2. But the apportionment to this department of legislative power does not sanction the exercise of executive or judicial functions, except in those cases, warranted by parliamentary usage, where they are incidental, necessary, or proper to the exercise of legislative authority, or where the constitution itself, in specified cases, may expressly permit it. Executive power is so intimately connected with legislative, that it is not easy to draw a line of separation; but the grant of the judicial power to the department created for the purpose of exercising it must be regarded as an exclusive grant, covering the whole power, subject only to the limitations which the constitutions impose, and to the incidental exceptions before referred to. While, therefore, the American legislatures may exercise the legislative powers which the Parliament of Great Britain wields, except as restrictions are imposed, they are at the same time excluded from other functions which may be, and sometimes habitually are, exercised by the Parliament."

Therefore, while a legislature may not encroach upon the constitutional powers of the executive department of the government, or the judiciary, nor, of course, interfere with powers delegated to the Federal Government, or violate rights vested in persons under the provisions of the State or Federal Constitution, its legislative powers are not otherwise limited. It is not required that its powers be enumerated in a state constitution. The grant of full legislative powers makes such enumeration unnecessary. As to the Federal Constitution the rule is different; there, the powers must be granted or necessarily implied.

That courts will not declare an act of the legislature unconstitutional except in cases where the legislature has clearly exceeded or misapplied its powers, seems to be settled law.

"It is an elementary principle that where the validity of a statute is assailed and there are two possible interpretations, by one of which the

statute would be unconstitutional and by the other it would be valid, the court should adopt the construction which would uphold it. It is the duty of courts to adopt a construction of a statute that will bring it into harmony with the Constitution, if its language will permit. The duty of the courts so to construe a statute as to save its constitutionality when it is reasonably susceptible of two constructions includes the duty of adopting a construction that will not subject it to a succession of doubts as to its constitutionality, for it is well settled that a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubt upon that score".
11 Am. Jur. 725.

For a full discussion of the rules which govern a court passing upon the constitutionality of a statute, see Cooley's Constitutional Limitations, Eighth Edition, Volume 1, page 332 to 358. In *Osburn* v. *Staley*, 5 W. Va. 85, 13 Am. Rep. 640, this Court held:

"While the Legislature is governed by the spirit of the Constitution, the courts cannot declare an Act of the Legislature invalid unless its invalidity is placed beyond a reasonable doubt. A reasonable doubt must be resolved in favor of the legislative action, and the Act be sustained. The courts must be guided by the express words of the Constitution, not by its opposed spirit. Whenever an Act of the Legislature can be so construed as to avoid conflict with the Constitution and give it force of law, such construction will be adopted by the courts".

This rule has never been departed from by this Court. *State* v. *England*, 86 W. Va. 508, 103 S. E. 400; *State* v. *Furr*, 101 W. Va. 178, 132 S. E. 504.

Having in mind the broad scope of legislative power, and the reluctance of courts to interfere with legislative action, where it is possible to square such action with the Constitution, I am of the opinion that when the Legislature attempted to prevent the Governor from appointing

to a public office, requiring Senate confirmation, any person who might theretofore have been rejected by the Senate, upon his nomination for an office other than the one to which it may be proposed to appoint him, it did not impose an unwarranted restriction on the constitutional power of the Governor to make recess appointments.

While it should be noted that this power of the Governor, properly exercised, is allowed to be so exercised without reference to the Senate, and the right of the Senate, to have a voice in the selection of public officials, is saved by the requirement, that, upon the convening of the Senate, the Governor shall make a nomination for the same office to which his recess appointment relates, I think it must be admitted that when the Legislature creates an office, it may prescribe how it may be filled, whether by election or appointment, and if by appointment, who shall appoint. The only limitation is that it cannot, itself, appoint. It can impose such terms and conditions upon the appointing power it creates as may seem expedient, so long as it is not arbitrary or unreasonable, and has some proper relation to the standing, qualification or eligibility of the proposed appointee, or to the duties of the office intended to be filled. At one time it was thought that citizenship, and the right to vote, was the sole necessary qualification to hold an office, except in cases where constitutional eligibility was defined, but since the decision in *Thompson* v. *McAllister*, 38 W. Va. 485, 18 S. E. 770, 24 L. R. A. 343, it has been the settled law in this State that the Legislature, in creating an office, or in providing for the election or appointment of county and municipal officers, may require qualifications and conditions of different characters, which requirements it may impose upon the appointive or elective power. For example, as to some offices within the appointing power of the Governor, he is required to provide for minority representation, based upon political party affiliations; in others, professional or business qualifications are required. These conditions and qualifications

touching offices to be filled by appointment of the Governor, are set out in the Act creating the office and could, of course, be set up in any amendment thereto. Usually they relate to what may be termed public policy, or some supposed necessary qualification. So long as a Legislature does not act in a clearly unreasonable and arbitrary manner, it may impose any qualification or conditions it desires upon the right to hold, or the power to appoint to, any office it creates; and it has the absolute power at all times to abolish any office it has created. That which it creates, it can destroy.

If the Legislature may exercise these powers, through legislative action in creating an office, and the Governor possesses no inherent power of appointment, why can it not, by general law, impose conditions upon the right of the Governor to make appointments during the recess of the Senate. If the Legislature, when it created the Board of Control, and empowered the Governor to appoint the members thereof, subject to Senate confirmation, had at the same time attached a condition thereto that no person who had been rejected by the Senate for that or any other office, could be nominated or appointed to said Board, I think it clear that the Governor would have been bound thereby, and I think the Act creating the Board could be amended by the Legislature and that condition imposed. If this be true, it is difficult to find a reason for saying that the Legislature may not, by general law, applying to all offices requiring Senate confirmation, impose such conditions upon the Governor's power to appoint.

It may be said that the restriction attempted to be imposed upon the Governor's power to appoint by Senate Bill No. 22 is arbitrary and unreasonable. It is pointed out that a person nominated by the Governor for one office may not, in the opinion of the Senate, possess the necessary qualifications for that particular office although he may possess all of the necessary qualifications for another and different office; and, therefore, that it is unreasonable to disqualify citizens of the State from holding any office, requiring Senate confirmation, if he has

been unfortunate enough to have been rejected by the Senate as to some other position. There is reason and force in this contention. On the other hand, who can say, in a particular case, that Senate rejection was not brought about by its belief that the person rejected was not of the class or type who should be permitted to hold any State position. By this observation it is not intended to suggest that the Senate action, in rejecting the relator, was based upon any such basis. However, I do not think that the Legislature went beyond its constitutional power in enacting the statute in question merely because, in a few instances, and for a limited time, citizens who have been nominated for office and rejected by the Senate should not be considered for certain appointments until the next session of the Senate. There is nothing in the Constitution which would prevent the submission, at the next session of the Senate, of the relator's name to the same office for which he was rejected, or to any other office requiring Senate confirmation. The Act in question does not in any wise encroach upon the power of the Governor, at the next session of the Senate, to nominate any person to any office coming within his power to appoint.

Public interest may be said to be involved and in seeing that public offices are kept occupied. This is true. There may not be another session of the Senate until January, 1945, in which event the vacancy in the Board of Control cannot be filled, and public interest may suffer thereby. The fact that this department of the State Government was permitted to go along for some ten months without a full Board, argues that no great public interest will suffer if the existing vacancy is suffered to continue. Be this as it may, I think a higher public interest will be served, by adhering to the constitutional provision which requires any chief executive to submit to the Senate for confirmation all vacancies in public office existing during a Senate session. The present controversy involves a single person, and, regrettable as it may be, a consideration of his personal interest in this litigation should not

be permitted to stand in the way of the pronouncement of a public policy for the years to come.

That part of the Senate Bill No. 22, which attempts to guard against any evasion of the Senate's right to pass upon the nominations of public officials, through the resignation of such officials before or during a session of the Senate, and their appointment to the same offices after the Senate has adjourned is, to my mind, a correct interpretation of the constitutional provisions covering the appointive power of the Governor. At some time in the future, when as is possible, political passions may run high, and the chief executive of the State may be at war with the Legislature, and particularly the State Senate, and the Governor could escape submitting the names of his appointees to the Senate by such a device as accepting their resignations, before or while the Senate was in session, and, after its adjournment, make re-appointments of the same person to the same office, practically the entire term of a Governor could pass without the Senate ever having an opportunity to advise and consent to any appointments which the Governor might make. Clearly such purpose was never intended, and the pertinent provisions of the Act in question do nothing more than prevent such a situation.

In my opinion Senate Bill No. 22 enacted by the Legislature of West Virginia at its recent session is constitutional, and the respondent was well advised in refusing to recognize relator's appointment as a member of the Board of Control as legal and valid. I would deny the writ prayed for.

I am authorized to state that Judge Kenna concurs, in principle, with the views expressed in this dissent, but reserves the right to file a memorandum touching points not discussed herein.

KENNA, JUDGE, dissenting:

This Court by a vote of three to two of its members is of the opinion that an act of the Legislature, considered twice by both houses and reenacted in opposition to the

Governor's veto, is unconstitutional and of no effect. The anomaly of the situation does not need to be emphasized.

One of the most firmly established principles of statutory construction is that it is the duty of a Court, if reasonably possible, to construe and interpret an enactment of the law-making body of the same sovereignty so as to sustain its constitutionality. Neither the political nor the practical effect of the enactment should be considered. To my mind the majority opinion is a complete departure from this fundamentally essential rule. I do not think that it is necessary to measure an act of the Legislature covering a designated class of persons who may not be appointed to a state office, as either an attack upon the Governor's appointive power or an unwarranted derogation of the privilege of a citizen to hold office. At this time, either is to attribute a certain degree of viciousness as a part of the purpose of both the Senate and the House of Delegates. On the other hand, if the act is looked upon as a general measure to prescribe necessary qualifications governing the eligibility of all who hold certain appointive offices, the only question to be determined remaining, is its reasonableness. That is to be presupposed until the enactment under consideration is shown to be capricious or arbitrary.

Of course, the Legislature created the office of member of the Board of Control, as it does, directly or indirectly, all state offices not created by the Constitution. That being so, it follows that the Legislature could abolish all offices it had created for reasons appearing to it to be sufficient. It could also, in the act creating any office, prescribe the requirements of eligibility, and it is very clear to my mind that if the Legislature, in each act creating a public office, had said that a person whose confirmation had been rejected by the Senate should not be eligible, that provision in each act would have been held constitutional. If that be true of separate acts creating each office, it is likewise true of a general act prescribing the same general qualification for certain offices. I do not see, when the act is looked upon as one defining and fixing the fitness, ability, reputation and so forth required to hold certain important

public offices, why it should be held unreasonable, capricious or arbitrary. The Legislature, of course, is the first and primary judge of the reasons which underlie its course of conduct. It might very well be that the two houses of the Legislature reached the conclusion that a person whose appointment to a public office had been refused confirmation by the Senate, if appointed during a recess to another public office without that confirmation, would be looked upon by the public as a misfit, and that the loss of prestige so suffered would detract from his ability to discharge his public duties. There are other plausible reasons which could be assigned as justifying the enactment, if that were necessary. Had the Legislature the power in the creation of an office to impose the provision in question as a part of the initial requirement of eligibility, to my mind it follows much more strongly that the Legislature could, instead of amending each act creating a state office and thus confining it clearly to the question of eligibility, prescribe it as a condition to the Governor's exercising his appointive power *in recess,* free from the requirement that the Senate confirm, as required by the Legislature. Certainly, its control over the manner of filling recess vacancies coincides in scope with its power to initially prescribe eligibility. If the Legislature is exercising its constitutional power of standardizing eligibility to public office, to my mind, the act should stand no matter how it is labeled.

The reasoning of the majority opinion that the effect of a rejection of confirmation by the Senate, because partly provided for by the Constitution, under the maxim *expressio unius est exclusio alterius,* by implication prohibits the Legislature from adding to its effect, to my mind, is clearly a misconception of the basis of legislative power. Under our system, our Constitution is not a grant of legislative power; if it were, the maxim might apply. But our Constitution is a restriction of the power of our Legislature and restrictions of power are not to be based upon other than express language and unavoidable implication. In order to be recognized they must be inevitable. But the

question is not new, so it need not be discussed at length. This Court has said: "The general powers of the legislature are almost plenary. It can legislate on every subject not interdicted by the constitution itself". *State Road Commission* v. *County Court,* 112 W. Va. 98, 163 S. E. 815. See also *State ex rel. Thompson* v. *McAllister,* 38 W. Va. 485, 488, 18 S. E. 770, 24 L. R. A. 343; *State* v. *Dent,* 25 W. Va. 1, 19. In the *Road Commission* case cited above at page 103 will be found a discussion of the maxim *expressio unius.* For a discussion as to its use in construing constitutional provisions relating to the Legislature, see *Pine* v. *Commonwealth,* 121 Va. 812, 93 S. E. 652.

The application of Section 9, Article VII, of our Constitution, to my mind, is quite plain. The Governor having no inherent appointive power, as far as recess vacancies are concerned, is granted by the Constitution only the right to "fill such vacancy, until the next meeting of the Senate, * * *". This vacancy occurred in May, 1942, and the next meeting of the Senate followed. After both occurrences the Governor undertook to appoint. Both of the constitutional provisions are for the purpose of seeing that the executive department is not hampered by recess vacancies, and that its entire functions are at all times promptly exercised. This duty rests upon the State's Chief Executive. If, in his judgment, the vacancy need not be filled before "the next meeting of the Senate", certainly it is no imposition to continue the operation of that conclusion until the Senate next convenes or is called together by the Governor. An officer unnecessary in one recess, is ordinarily not indispensable in the following recess, but if the office must be filled, that may be done without what to my mind is plainly adding to the Governor's constitutional powers.

As to the inferred impropriety involved in this Court's noticing that the vacancy on the Board of Control had existed prior to the last regular session of our Legislature for the reason that that fact did not appear in the petition nor in the respondent's reply and was shown by stipulation only, I wish to say that I regard it as an unfortunate

misapplication of the technical rules of common law pleading to a mandamus proceeding. I say this realizing, of course, that mandamus is now a proceeding that partakes of the nature of a private remedy rather than the exercise of prerogative. Nevertheless, there are some characteristics of its former self that it has not lost, and among them is basing the Court's conclusion in granting or declining the peremptory writ upon the actual realities to the extent that they are ascertainable, particularly those that are matters of common knowledge. A great deal could be said concerning the nature of the present mandamus proceeding. This is altogether unnecessary to my mind, due to the fact that in this State it is largely governed by fact, and we are not powerless to inquire nor are we required to pass upon the matters involved according to an incomplete showing made by the pleadings. Code, 53-1-8, provides: "The writ peremptory shall be awarded or denied according to the law and the facts of the case * * *". In some instances, as here, the commonly known and undisputed "facts of the case" cannot be ascertained entirely from the allegations of the pleadings, and well known relevant matters the Court certainly should not purposely disregard. I look upon the stipulation as being unnecessary, and the result of a course pursued by one of the judges of this Court, without objection, through an abundance of precaution. The approximate time of a vacancy in one of the principal executive offices of this State is unquestionably a matter of public concern and a fact of which this Court, I believe, would be required to take judicial notice. I do not see how judicial vision can be defended if we ignore it.

As to the title to the act not covering its subject matter relating to eligibility, but confining it to the appointive power of the Governor, I believe that a casual reading of that part of the act appearing in the majority opinion will dispel all questions of that sort. Under our cases a distinction is drawn between an amendatory and an original act. We are not dealing with an original act here. The title refers to the chapter, article, and section of the Code

to be amended. A reading of that section before the amendment shows quite plainly that it does define eligibility to public offices, the appointment to which requires the confirmation of the Senate. A glance at the amending act shows that it does exactly that. No more: no less. I see no difficulty created by the title. If the original act had a good title—and it had—the amending act needed no more than an accurate reference. That it had. *Laing* v. *Fox*, 115 W. Va. 272, 283, bottom, 175 S. E. 354, and cases there cited.